NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0431n.06

No. 16-5146

FILED
Jul 28, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FRANK DOOLEY, JR.,                               )
                                                 )
    Plaintiff-Appellant,                         )
                                                 )
v.                                               )          ON APPEAL FROM THE
                                                 )          UNITED STATES DISTRICT
COMMISSIONER OF SOCIAL SECURITY,                 )          COURT FOR THE WESTERN
                                                 )          DISTRICT OF TENNESSEE
    Defendant-Appellee.                          )
                                                 )
                                                 )

BEFORE:    SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge. Frank Dooley, Jr. appeals the district court's judgment affirming the Commissioner of Social Security's denial of Dooley's request for social security disability benefits. Dooley contends that the administrative law judge ("ALJ") erred in concluding that Dooley's subjective complaints were not fully consistent with the record. Dooley also argues that the ALJ gave insufficient weight to a consultative examiner's opinion that Dooley had significant limitations on his ability to sit, stand, and walk. The ALJ applied the correct legal standards in reaching his decision, and substantial evidence supports his conclusions that Dooley's statements about his symptoms were not fully consistent with the record and that the consultative examiner's opinion was vague and unsupported by the doctor's own examination notes. Dooley's arguments therefore do not provide a basis for relief.

Dooley was born on October 3, 1962. He has a GED and has engaged in past relevant work as a forklift driver, a gate guard, and a delivery driver. He had a job as a delivery driver until September 2011, when he lost his driver's license. In April 2012, Dooley applied for social security disability insurance benefits and supplemental security income benefits. Dooley alleged that his disability began on September 18, 2011.

In December 2008, prior to his alleged onset date, Dooley was in a car accident. Although Dooley had several spinal fractures, his condition was largely stable and his injuries did not require admission to the hospital. In August 2009, Dooley's doctor placed him at "maximum medical improvement," with no working restrictions.

During the next couple of years, however, Dooley continued to suffer from pain and other health issues. During this time, Dooley sought medical treatment for pain in his right hip and leg. Dooley was also diagnosed with sciatica, diabetes, and severe obstructive sleep apnea. Sciatica is a "syndrome characterized by pain radiating from the back into the buttock and along the posterior or lateral aspect of the lower limb." Dorland's Illustrated Medical Dictionary 1678 (32d ed. 2012). Dooley also began seeking treatment for his diabetes at the Church Health Center, a low-cost medical clinic.

After his alleged disability onset date on September 18, 2011, Dooley continued to receive medical treatment from the Church Health Center. From June 2012 to February 2013, he returned periodically to the clinic, seeking treatment for his diabetes, hypertension, depression, testicular problems, possible diabetic neuropathy, a sinus infection, pain in his left wrist, high sugar intake in his diet, and a scrotal abscess. Dooley's treatment notes stated that he was obese and had hypertension, a depressive disorder, and uncontrolled diabetes. He was instructed to

check his blood sugar levels and encouraged to engage in regular exercise, eat a healthy diet, and lose weight.

In July 2012, Dooley underwent a consultative examination with Dr. Linda Yates. Dr. Yates noted that Dooley "was able to get up and walk across the room without any difficulty," did not limp, and "could tandem gait, heel gait, toe gait, and stand alone on either foot." Dooley had full active range of motion of his cervical spine, both shoulders, both elbows, both ankles, and both hips, as well as full strength in all four of his extremities. Dooley complained of some right thigh pain during his examination. Dr. Yates noted that Dooley had lumbar pain radiating into his buttocks. Dr. Yates opined that Dooley could sit for four to six hours in an eight-hour day for one-hour durations and could stand and walk for two to three hours in an eight-hour day for twenty-minute durations. Dr. Yates also stated that Dooley could perform "[n]o climbing" and "[n]o excessive bending, kneeling or squatting secondary to his knees and back."

Later in July 2012, Dooley underwent a consultative psychological examination with Dr. Carl E. Gilleylen. Dooley told Dr. Gilleylen that he was depressed and that he took Prozac. Dooley also described his daily activities to Dr. Gilleylen, stating that he could manage his own finances, prepare "elaborate" meals, wash dishes, and push a lawnmower if he took a break "every few yards," but could not mop or sweep. Dr. Gilleylen diagnosed Dooley with depressive disorder with mixed anxiety and depressive symptoms.

In September 2013, Dooley was a driver in an automobile accident. He received medical treatment at the Saint Francis Hospital, where he was diagnosed with a cervical sprain, an ankle sprain, and a foot contusion. An x-ray of his cervical spine indicated that although Dooley had no fractures, destructive lesions, or soft tissue swelling, Dooley had chronic spondylosis. Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae,

intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots." Dorland's Illustrated Medical Dictionary at 1754. Dooley was discharged in a stable condition with a prescription for pain medication.

Following the denial of his application for social security and supplemental security income disability benefits, Dooley requested a hearing before an ALJ. At the hearing, Dooley testified that he stopped working in September 2011 due to complications from his sleep apnea and back and neck injuries, as well as the loss of his driver's license.

Dooley said that he did not have any medical insurance. He obtained his medical care from the Church Health Center, which charged him $25 to $35 per visit. Dooley could not afford to pay that much but was able to borrow money from his friends and family to cover the costs of his visits. Dooley also stated that he had not needed to pay for his insulin for the "past month" because the clinic had given him a donation.

Dooley testified he had diabetes, sleep apnea, high blood pressure, depression, arthritis, and chronic sciatica. Despite his use of a continuous positive airway pressure ("CPAP") machine to treat his sleep apnea, Dooley had difficulty staying awake during the day. Dooley also said that he took Prozac for his depression but could not afford to see a psychologist or psychiatrist.

Dooley testified that although his neck and back caused "constant pain," Naproxen, an anti-inflammatory medication, was the only pain medication that he took "regularly." In the past, when the pain had become "really severe," Dooley had occasionally also taken Lortab, a narcotic medication. Dooley claimed that he could stand for a maximum of fifteen to twenty minutes at a time and could walk a maximum of a block or a block and a half at a time due to his

pain, weakness, and shortness of breath. He said that he could sit for twenty minutes if he did not have his legs elevated and could lift twenty-five pounds occasionally and ten or fifteen pounds more frequently.

Dooley also testified about his daily activities. He and his estranged wife cared for his stepdaughter's children, but the activity level required of Dooley was "minimal" because his wife cooked and fed the children. Dooley said that although he used to enjoy playing with his grandson, "[t]hat doesn't happen anymore." Dooley also assisted his wife with chores, putting laundry in the washer, folding clothes, and doing "a little sweeping." Dooley said that he smoked a pack of cigarettes every two weeks, but only if someone else would agree to get the cigarettes for him.

Describing the circumstances of his September 2013 car accident, Dooley said that because he did not have a driver's license, he did not usually drive. However, after he received a call that no one had come to pick up his six-year-old grandson at school, Dooley took his wife's car to make the approximately two-mile trip to the school. During his drive home from the school, Dooley rear-ended another vehicle, perhaps because he had fallen asleep while driving.

In a written decision issued in January 2014, the ALJ concluded that Dooley was not disabled. The ALJ determined that Dooley suffered from "the following severe combination of impairments: hypertension, diabetes, obesity, disorders of the back and neck, osteoarthritis, obstructive sleep apnea, affective disorder, and anxiety disorder." The ALJ reasoned that the combination of these impairments, although significantly limiting Dooley's ability to perform basic work activities, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Considering Dooley's residual functional capacity ("RFC") to perform "physical and mental work activities on a sustained basis despite limitations from his impairments," the ALJ determined that Dooley could "frequently climb ramps/stairs, and frequently balance, stoop, kneel, crouch, and crawl." He was also "able to understand, remember, and carry out simple and detailed instructions; use judgment; relate to supervisors, coworkers, and usual work situations[; and was] able to deal with occasional changes in a routine work setting." The ALJ concluded that Dooley had the RFC "to perform medium work as defined in 20 [C.F.R. §§] 404.1567(c) and 416.967(c), except he must never climb ladders, ropes, or scaffolds."

In making this determination, the ALJ gave "[l]limited weight" to Dr. Yates's opinion. The ALJ explained that Dr. Yates's physical examination of Dooley "was generally benign" and the doctor's findings did not support the physical limitations that she imposed on Dooley. Also, Dr. Yates's limitation against "'excessive' bending, kneeling, or squatting" was "vague and not objectively measurable." The ALJ gave more weight to the opinions of two state-agency medical consultants. These consultants opined that Dooley was capable of occasionally lifting or carrying fifty pounds, frequently lifting or carrying twenty-five pounds, and sitting, standing, or walking for six hours each in an eight-hour workday.

The ALJ also concluded that Dooley's statements about "the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." Dooley had received "conservative care for his impairments consisting of narcotics and muscle relaxers" and had not received "any epidural steroid injections for his complaints of pain" or "participated in physical therapy." While Dooley had received medical treatment at the Church Health Center "for various complaints, his lab results were generally normal, and his medical providers did not place work-related limitations on [Dooley]." The ALJ acknowledged Dooley's testimony that he

could not afford mental health treatment, but noted that Dooley had never "attempted to avail himself of no cost to low cost medical providers within his surrounding community." Further, Dooley's cigarette smoking indicated that although he had "at least some money to put towards his healthcare needs," instead of trying to obtain more aggressive medical treatment, "he [chose] to spend his money on items that may further damage his health."

The ALJ also observed that Dooley's daily activities indicated that he could function at "a greater level" than he had alleged. Dooley was able to "tend to his personal hygiene, make a sandwich, use the microwave, prepare elaborate meals, wash dishes, sweep, help care for his grandchildren, take public transportation independently, attend church, handle his finances, do yard work, play with his grandchildren, wash laundry, and watch television." These activities were "representative of an active lifestyle" and "not indicative of a significant restriction of activities or constriction of interests." Further, Dooley's reports to medical providers that he had stopped driving conflicted with evidence indicating that Dooley sometimes drove.

Based on Dooley's RFC, the ALJ determined that Dooley was "capable of performing [his] past relevant work as a fork lift operator, gate guard, and delivery driver." The ALJ therefore concluded that Dooley was not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Dooley sought judicial review of the Commissioner's decision in federal district court, arguing that the ALJ should have given more weight to Dr. Yates's opinion and that the record did not support the ALJ's assessment of Dooley's subjective complaints. The district court affirmed the Commissioner's decision. *Dooley v. Colvin*, 2:15-cv-02425-cgc, 2015 WL 9077689, at *7 (W.D. Tenn. Dec. 16, 2015). The district court concluded that the ALJ had "fully" described the support that Dr. Yates provided for her opinion before determining that the

doctor's opinion was "internally inconsistent." *Id*. at *4. The district court therefore held that "the ALJ clearly followed the six-factor test as required by 20 C.F.R. § 404.1527(c) and § 416.927(c) in determining the appropriate weight to be assigned to Dr. Yates's opinion." *Id*.

The district court also held that substantial evidence supported the ALJ's assessment of Dooley's subjective complaints. *Id*. at *7. Although Dooley claimed that he could not afford aggressive medical treatment, Dooley received medical treatment from the Church Health Center and was able to borrow money from his family and friends to pay for health care and to purchase cigarettes. *Id*. at *5. The district court held that substantial evidence therefore supported the ALJ's conclusion that Dooley's failure to seek aggressive medical treatment weighed against his credibility. *Id*. Further, although the ALJ "could have been more precise as to [Dooley's] activities with his grandchildren and his yard work," substantial evidence supported the ALJ's overall conclusion that Dooley's daily activities indicated that he could function at a greater level than he alleged. *Id*. at *6. The record also supported the ALJ's determination that Dooley sometimes drove even though he had told his medical providers that he did not drive. *Id*. at *7. The district court therefore affirmed the Commissioner's denial of Dooley's claim. *Id*.

We review de novo the district court's decision that the Commissioner properly denied disability benefits to Dooley. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence. The substantial-evidence standard is met if a reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405−06 (6th Cir. 2009). Dooley argues that the ALJ erred by (1) concluding that Dooley's testimony about his pain and other symptoms was less than fully credible and (2) giving insufficient weight to Dr.

Yates's opinion. The ALJ's determinations with respect to these two issues were supported by substantial evidence and the ALJ applied the correct legal standards. Dooley's arguments therefore do not provide a basis for relief.

Dooley contends that the record does not support the ALJ's decision that Dooley's testimony about his pain and other symptoms was less than fully credible. "There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record. . . . Nevertheless, an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475−76 (6th Cir. 2003). "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Substantial evidence supports the ALJ's assessment of Dooley's subjective complaints. The ALJ concluded that the fact Dooley had received only "conservative care for his impairments" indicated that his pain and other symptoms were not as severe as he alleged. The record supports this conclusion. An "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). However, before drawing a negative inference from an individual's failure to "seek or pursue regular medical treatment," the ALJ must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id*. For

instance, "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id*. at \*8.[1] Although Dooley claimed that his neck and back caused him to suffer from "constant pain" and that he had significant walking, standing, and sitting limitations, Dooley sought little medical treatment to address these complaints following his alleged disability onset date in September 2011 even though he was able to receive medical treatment from the Church Health Center. Further, when Dooley did visit the Church Health Center and other medical providers during this time period, he generally did not complain of disabling pain and significant walking, standing, and sitting limitations, but instead sought treatment for his diabetes, hypertension, and other health issues. For instance, when Dooley visited the Church Health Center in 2012 and 2013, he sought treatment for his diabetes, hypertension, depression, and other health issues, but did not complain of pain due to his neck or back or difficulty standing, walking, or sitting. Similarly, when Dooley visited the Saint Francis Hospital, he sought treatment for pain in his groin, a scrotal abscess, pneumonia, and injuries following his 2013 car accident.

Dooley's medical records from this time period do not indicate that he received any epidural steroid injections for his pain or participated in physical therapy. Instead, Dooley relied on narcotic drugs and anti-inflammatory medication to treat his pain. Further, although Dooley said that he could not afford to see a specialist for mental health treatment, the record does not indicate that he ever sought mental health treatment from no-cost to low-cost providers within his community. The ALJ could therefore reasonably conclude that Dooley's failure to seek more

---

[1]After the ALJ's January 2014 decision was issued, the Commissioner issued a new ruling, SSR 16-3p, which supersedes SSR 96-7p. 2016 WL 1119029 (Mar. 16, 2016). SSR 96-7p "eliminat[es] the use of the term 'credibility' from [the Commissioner's] sub-regulatory policy" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." *Id*. at \*1. However, SSR 16-3p does not alter the rule that the ALJ should consider "possible reasons" why a claimant failed to seek medical treatment "consistent with the degree of his or her complaints" before drawing an adverse inference from the claimant's lack of medical treatment. *Id*. at \*8. Accordingly, we need not reach the issue of whether this ruling applies retroactively.

aggressive medical treatment indicated that his pain and other symptoms were not as severe as he alleged.

Dooley contends that because "the record reflects" that he had difficulty "affording even basic primary care, the ALJ should not have drawn an adverse inference from his failure to visit a specialist or to seek more aggressive treatment options." This argument fails because Dooley received medical treatment at the Church Health Center even though he lacked health insurance. Further, Dooley was able to borrow money from family and friends to pay the $25 to $35 fee that the clinic charged him for each visit. Dooley also testified that the Church Health Center continued to treat him even though the clinic was "not supposed to" and that the clinic had donated Dooley's insulin costs for his most recent month. Dooley cites no evidence that indicates that the Church Health Center was unable or unwilling to provide him with more aggressive treatment options for his pain and other symptoms. The ALJ therefore had an adequate basis for concluding that Dooley's subjective complaints were not fully consistent with the record.

Dooley also contends that the ALJ erred in relying on Dooley's cigarette smoking as a factor weighing against his credibility and his complaints of inability to afford medical care. This contention is unavailing. Although Dooley testified that he smoked only a pack of cigarettes every two weeks, when someone else agreed to get the cigarettes for him, Dooley's medical records indicate that he might have been able to afford to buy cigarettes more frequently than he was willing to acknowledge at his hearing. In 2012, Dooley told a medical provider at the Saint Francis Hospital that he smoked half a pack every day, and Dr. Yates stated that Dooley smoked four or five cigarettes per day. The ALJ could therefore conclude, consistent

with the record, that Dooley's smoking indicated that he had "least some money to put towards his healthcare needs."

Substantial evidence also supports the ALJ's conclusion that Dooley's daily activities were inconsistent with his alleged limitations. Daily activities are one factor that an ALJ may consider in evaluating "the intensity and persistence of [a claimant's] symptoms . . . and determining the extent to which [these] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(3)(i); 416.929(c)(3)(i). Dooley's ability to take public transportation independently, attend church, care for his grandchildren, prepare elaborate meals, make sandwiches, do laundry, wash dishes, and tend to his personal hygiene indicates that he was capable of performing tasks that required some physical exertion. Dooley's ability to perform other, less physical activities, such as handling his finances and watching television, also supports the ALJ's determination that Dooley's pain and other symptoms did not significantly restrict his daily activities.

Dooley resists this conclusion by contending that "nothing in [his] daily activities" suggested that he was "capable of performing medium work." To support this assertion, Dooley contends that a person who was unable to work would be capable of many of the activities that the ALJ cited, such as making sandwiches, doing the dishes, and watching television. Dooley also argues that ALJ erred because he stated that Dooley could play with his grandchildren, do yard work, and sweep even though Dooley said that he could not play with his grandchildren, was only able to sweep "a little," and could only push a lawnmower for a few yards before taking a break. These arguments are not compelling. It is true that Dooley's inability to play with his grandchildren and his limited ability to sweep and do yard work support his allegation that he had significant sitting, standing, and walking limitations. However, "if substantial

evidence supports the ALJ's decision, this [c]ourt defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without fear of court inference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). As stated above, substantial evidence supports the ALJ's overall conclusion that Dooley's ability to perform a wide variety of daily activities, "when viewed in conjunction with the other inconsistencies" in the record, indicated that he could function at a greater level than he alleged.

Dooley also contends that the ALJ erred in concluding that Dooley's misleading remarks about his driving activities indicated that his pain and other symptoms were not as severe as he alleged. To support this assertion, Dooley argues that he acknowledged that he was the driver in a 2013 car accident at his hearing, and in any event, his limited driving activities said "little about his functional abilities." This argument also fails to warrant reversal. Dooley repeatedly claimed that he stopped driving due to the loss of his driver's license in 2011. However, Dooley was the driver in a motor vehicle collision in 2013 and may also have driven the personal vehicle that transported him to the Saint Francis Hospital in 2012. It is true that the fact that Dooley drove on one or two occasions after his alleged disability onset date does not by itself establish that he had the capacity to do medium work. However, the conflict between his statements that he no longer drove and the evidence establishing that he did sometimes drive supports the ALJ's determination that Dooley's statements about his physical limitations were not fully consistent with the record.

In addition to arguing that the ALJ's assessment of Dooley's subjective complaints was not supported by substantial evidence, Dooley argues that the ALJ gave insufficient weight to the

report of the consultative examiner, Dr. Yates.  An ALJ must determine how much weight to give to each of the medical opinions in the record.  20 C.F.R. §§ 404.1527(c), 416.927(c).  In making this determination, the ALJ should consider various factors, including (1) whether the medical source who provided the opinion has examined the claimant; (2) whether the source treated the claimant; (3) the amount of relevant evidence the source provided to support the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors, such as the source's knowledge of the Commissioner's disability programs and the extent to which the source is familiar with the claimant's history of treatment.  20 C.F.R. §§ 404.1527(c)(1)−(6); 416.927(c)(1)−(6).  Contrary to Dooley's contention on appeal, the record supports the ALJ's decision to give "[l]imited weight" to Dr. Yates's opinion.

Substantial evidence supports the ALJ's determination that the physical limitations that Dr. Yates placed on Dooley were vague and unsupported by the "generally benign" clinical signs and symptoms that Dooley exhibited during his physical examination.  During his physical examination with Dr. Yates, Dooley "was able to get up and walk across the room without any difficulty" and "had no limp."  Dooley could also "tandem gait, heel gait, toe gait, and stand alone on either foot," and he exhibited full active range of motion in his cervical spine, both ankles, and both hips, and exhibited full motor strength in all four of his extremities.  Despite these examination results, Dr. Yates opined that Dooley could walk and stand for only twenty minutes at a time, could sit for only one hour at a time, and could not perform any "excessive bending, kneeling, or squatting."  Dr. Yates did not explain why she had chosen such restrictive limitations for Dooley or quantify the amount of time that he could spend bending, kneeling, or

squatting. The record therefore supports the ALJ's conclusion that the physical limitations that Dr. Yates placed on Dooley were vague and unsupported by the doctor's own examination notes.

Dooley contends that the ALJ should have given more weight to Dr. Yates's opinion because Dr. Yates observed that Dooley had lumbar pain radiating down his right leg and because Dooley's other treatment notes support his claim that his lower back pain radiated to both of his legs. These arguments fail because the evidence that Dooley cites, although providing some support for the physical limitations that Dr. Yates imposed on Dooley, does not establish that the ALJ lacked substantial evidence for concluding that Dr. Yates's opinion was internally inconsistent. Dooley also claims that his ability to "ambulate a few steps" in Dr. Yates's office does not establish that he could stand and walk for six hours in an eight-hour workday, but it was reasonable for the ALJ to conclude that Dooley's apparent ability to walk without difficulty during his physical examination contradicted Dr. Yates's opinion that Dooley was only able to walk for twenty minutes at a time.

Dooley also contends that to the extent the ALJ was unclear about the basis for Dr. Yates's opinion, the ALJ should have contacted Dr. Yates for clarification instead of according her opinion limited weight. This argument fails because, under the regulations, the agency will recontact a consultative examiner for clarification when the examiner's report is "inadequate or incomplete." 20 C.F.R. § 404.1519p(b). Dr. Yates's report, although inconsistent with the clinical signs and symptoms that Dooley exhibited during his physical examination, was not inadequate or incomplete. The agency in reviewing a consultative examiner's report considers whether it provides "evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses." 20 C.F.R. § 404.1519p(a)(1). As explained above, the information that Dr. Yates's report included about the "generally benign" results of Dooley's physical

examination provided the ALJ with an adequate basis to give limited weight to Dr. Yates's assessment of Dooley's physical functioning. Further, although Dr. Yates failed to clarify her limitation against "excessive" bending, kneeling, or squatting, this failure does not render her report incomplete. This is because a consultative examiner's report is not rendered incomplete by the absence of a statement about what a claimant can still do despite his limitations. 20 C.F.R. §§ 404.1519n(c)(6); 416.919n(c)(6). Because Dr. Yates's report was not inadequate or incomplete, the ALJ did not have to contact Dr. Yates for clarification.

Dooley further argues that even if the ALJ was not required to contact Dr. Yates for clarification, the ALJ's decision not to seek further information from Dr. Yates was an abuse of discretion. To support this contention, Dooley argues that because his limited finances prevented him from receiving the specialized treatment that he needed to support his claim, "Dr. Yates's examination had a heightened importance in this case." Dooley contends that therefore "if Dr. Yates did an inadequate job, the fairest course of action would have been for the ALJ to seek clarification rather than penalizing Dooley for the doctor's failure to offer a more detailed analysis." It is true that an ALJ may contact a medical source for further clarification when the record contains insufficient evidence for the ALJ to make a determination as to whether the claimant is disabled. 20 C.F.R. § 404.1520b(c)(1). However, the ALJ's thorough opinion demonstrates that he carefully considered the entire record, including Dr. Yates's opinion, Dooley's treatment notes from the Church Health Center and the Saint Francis Hospital, opinions from two state agency reviewing physicians, and Dooley's testimony at his hearing, before determining that there was sufficient evidence in the record to conclude that Dooley was not disabled. The ALJ's decision not to contact Dr. Yates for clarification was therefore not an abuse of discretion.

The judgment of the district court is affirmed.